# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COOPER TIRE & RUBBER COMPANY,

        Plaintiff,

      v.

APOLLO (MAURITIUS) HOLDINGS PVT. LTD., APOLLO TYRES B.V., and APOLLO ACQUISITION CORP.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Civil Action No. 8980-VCG*

## MEMORANDUM OPINION

Date Submitted:  July 9, 2014
Date Decided: October 31, 2014

Stephen C. Norman, Kevin R. Shannon, John A. Sensing, and Christopher N. Kelly, of POTTER ANDERSON & CORROON LLP; OF COUNSEL:  Robert S. Faxon, Michael A. Platt, Louis A. Chaiten, Kyle T. Cutts, and Marjorie P. Duffy, of JONES DAY, Attorneys for the Plaintiff.

Raymond J. DiCamillo, Susan M. Hannigan, and Christopher H. Lyons, of RICHARDS LAYTON & FINGER, P.A.; OF COUNSEL:  John L. Hardiman, Robin D. Fessel, Adam R. Brebner, Laura K. Oswell, Oded Zaluski, Asel Aliyasova, and Christen M. Martosella, of SULLIVAN & CROMWELL LLP, Attorneys for the Defendants.

GLASSCOCK, Vice Chancellor

This matter involves the unraveling of the Agreement and Plan of Merger (the "Merger Agreement") by which a large Indian tire manufacturer—Apollo (Mauritius) Holdings Pvt. Ltd ("Apollo")—was to buy a large American tire company—Cooper Tire & Rubber Company ("Cooper"). Among other reasons, acquisition of Cooper was attractive to Apollo because it would provide Apollo an entrée into the Chinese market; a significant part of Cooper's business was its majority ownership of an affiliate, a Chinese tire manufacturer, Chengshan Cooper Tires ("CCT"). Once the merger was announced, however, Cooper's ownership of the affiliate emerged as a major obstacle to the deal's consummation. The minority partner of CCT—known as Chairman Che—either vehemently opposed the merger or saw it as an opportunity to extort value from the parties beyond what his minority interest would justify. In either case, he used his position of authority over the workers and their union to physically seize the CCT facility, prevent production of Cooper products there, and deny access of the parties to the facility and to CCT's financial records.

Consummation of the deal encountered another obstacle: Cooper faced resistance from its own domestic union, the United Steelworkers ("USW"), which argued that the merger triggered a contractual right to renegotiation in several of its collective bargaining agreements. An arbitrator agreed, and Cooper and Apollo reluctantly entered into an agreement with the USW whereby the merger could not

close until a settlement was reached as to the collective bargaining agreements. Initially barred from the negotiating table by Apollo due to its historically poor relations with its labor unions, Cooper became increasingly frustrated by Apollo's lack of progress in negotiating with the USW. As the deadline loomed for Cooper to report its third quarter financials—a condition to closing the merger, which Cooper could not fulfill due to the disruption at CCT—Cooper began to suspect that Apollo had grown cold to the merger and was failing to negotiate with the USW in good faith in order to avoid consummating the transaction.

Once Cooper suspected bad faith, the Merger Agreement came a cropper. Cooper sued, seeking specific performance or damages for breach of contract. Apollo counterclaimed, requesting that I declare that Cooper had failed to meet all conditions to closing, and was therefore not entitled to relief. The matter moved on an expedited schedule to trial, where Cooper asked me to quickly consider the specific performance issue in isolation, citing exigencies of its impending financial reporting obligation. I complied with Cooper's request; in a November 8 bench ruling, supplemented the next day by a letter opinion (together, the "USW Opinions"), I found that the failure to reach an agreement with the USW prevented the transaction from closing at that time, that this failure was not the result of a contractual breach on Apollo's part, and thus that Cooper was not entitled to specific performance. Because Cooper represented that appellate relief would be

3

meaningless if not given immediately, I certified an interlocutory appeal on the narrow grounds of my ruling on specific performance. While that appeal was pending, however, Cooper dropped its request for specific performance, notifying the Supreme Court that it instead intended to terminate the merger and sue for damages under the reverse termination fee provisions of the Merger Agreement (the "Reverse Termination Fee"). The Supreme Court dismissed the interlocutory appeal as improvidently accepted, and shortly thereafter Apollo moved for an order temporarily restraining Cooper from drawing on a letter of credit for the Reverse Termination Fee and, in an effort to permanently prevent Cooper from seeking the Reverse Termination Fee, a judicial declaration on its counterclaim that Cooper had not satisfied all conditions to closing the merger as of the trial date. This Memorandum Opinion addresses the latter issue, and the effect that the rather bizarre events in China had on Cooper's ability to perform as called for in the Merger Agreement. For reasons arising from the takeover at CCT, and independent of the failure to reach an agreement with the USW, I find that Cooper was unable to satisfy all conditions to closing.

## I. SCOPE OF THIS OPINION

I first turn to the appropriate scope of this decision. Due to the convoluted procedural posture of the case, the parties disagree as to what is left for me to decide. This action is before me on Apollo's post-trial Motion for Entry of a

4

Declaratory Judgment on its counterclaim, in which Apollo has asked this Court to declare that "the conditions to closing had not been satisfied prior to the trial of this action, and Cooper [was], thus, not in a position to close the merger."[1] Cooper contends that addressing this Motion in full is inappropriate, given my USW Opinions, in which I determined that Cooper was not entitled, as of that date, to specific performance of the merger agreement, because closing was conditioned on Apollo entering into an agreement with the USW and because Apollo had not (as of that time) breached its obligation to use best efforts in reaching such a resolution. Cooper suggests that "[b]ecause the Court's decision as to the USW is sufficient by itself to grant a declaratory judgment for Apollo, the Court should refrain from reaching any other issue."[2]

I rejected that contention in a letter opinion on January 27, 2014,[3] for reasons that I repeat briefly here. In the USW Opinions, I addressed a request for equitable relief on a rigorously expedited schedule so that, if appropriate, the merger could close before Cooper was required to produce its third quarter financials, a contractual requirement it knew it could not meet due to the lockout at CCT. The precise issue before me now—whether Cooper had satisfied all conditions to closing the merger—was not before me in the USW Opinions, in

---

[1] Defs.' Mot. for Declaratory J. at 1.
[2] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 12–13.
[3] *See Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, C.A. No. 8980-VCG (Del. Ch. Jan. 27, 2014).

5

which I determined that Cooper was not entitled to specific performance as of the trial date, but also that the parties' obligations under the merger agreement remained outstanding. At any rate, as an appeal of my USW Opinions appears inevitable, I believe it appropriate to resolve the issues arising from the CCT takeover presented at trial, in the interest of judicial efficiency; in doing so, I note that these issues were presented in detail at a three-day expedited trial, have been fully briefed, and may ultimately be dispositive if the case is remanded.

For its part, Apollo contends that, if I am to evaluate the conditions to closing beyond the failure to reach an agreement with the USW, I should make that determination as of November 14, 2013, the date Cooper was required to (and failed to) file its third quarter financials. In contrast, Cooper suggests in briefing that my holding should be limited to the period before October 10, 2013, arguing that "it would be inappropriate for Apollo now to obtain a declaration that covers the period through the date of trial," given that "Apollo's counterclaim for a declaratory judgment was commenced on October 10, and included allegations only through that date;" "Apollo never filed a supplemental pleading;" "the parties agreed to collect document discovery only through October 10;" and "Apollo successfully prevented Cooper from including at trial any post-October 10 claims by Cooper relating to the tentative agreement with the USW."[4] I find it appropriate

---

[4] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 13.

that I determine this matter as of the date of trial. In its Motion, Apollo itself requested a determination "prior to trial of this action." Further, at oral argument on the pending Motion, Cooper's counsel indicated that the facts relevant to my analysis, at least with respect to the ongoing lockout at CCT and Cooper's inability to produce financials, had not changed between October 10, 2013 and the date of trial.[5] Accordingly, I do not feel required to expand my decision as Apollo requests or constrain my decision as Cooper requests. Rather, the appropriate scope of the issue before me now is, setting aside the issues surrounding negotiations with the USW, whether Cooper had satisfied the conditions to closing the merger as of the trial date.

## II. BACKGROUND

A. *The Cooper-Apollo Merger*

Cooper, a Delaware corporation, is the fourth largest tire manufacturer in North America and the eleventh largest tire company in the world.[6] Cooper employs 13,000 people globally,[7] and its revenues in 2012 were more than $4 billion.[8]

---

[5] *See, e.g.*, July 9, 2014 Oral Arg. Tr. 67:4–7 (explaining that, following the announcement of the termination of the Merger Agreement, "[t]he [CCT] labor union relinquished their control over the facilities. The facilities went back to work producing all tires. Cooper's financials are now current and have been for some time."); *id.* at 68:1–5 ("But there is no record of anything that happened after the trial. . . . The only issues are those that stood at the time of trial.").

[6] Defs.' Countercl. ¶ 11; Trial Tr. 13:5–7 (Armes).

[7] Trial Tr. 13:20 (Armes).

[8] *Id.* at 13:22.

Apollo is an Indian tire manufacturer founded in 1975 and organized under the laws of the Republic of Mauritius. In 2005, the business began to expand globally, and by 2010, Apollo had grown into a $2 billion company.[9] By 2013, Apollo viewed an acquisition of Cooper's foothold in China—CCT, a joint venture with Chengshan Group that accounted for roughly 20% of Cooper's business in 2012—as vital to its efforts at global expansion.[10]

According to the testimony elicited at the November 2013 trial, Cooper's business plan in 2012 focused primarily on acquiring smaller companies; Cooper did not originally plan to sell its business.[11] Cooper and Apollo initially met in 2012 to discuss the possibility of a joint venture.[12] A joint venture between the two companies never materialized, and in January 2013, Apollo approached Cooper about a potential acquisition. Over the next several months, Apollo made bids to purchase Cooper for $22.75, $25 to $26, $33, $33.75, and finally $35 per share.[13]

During that negotiation period, Cooper entertained at least one other potential bidder: Chengshan Group, Cooper's 35% Chinese joint venture partner at CCT.[14] The Chairman of Chengshan Group, Chairman Che, organized an

---

[9] *Id.* at 545:17–546:17 (Kanwar).
[10] *Id.* at 548:6–549:24; Pl.'s Pre-Trial Br. at 9.
[11] Trial Tr. at 16:1–4 (Armes).
[12] *Id.* at 16:8–17. Cooper and Apollo had also previously discussed cooperation in certain other projects, including one that would facilitate Cooper's expansion into the South African tire market. *Id.* at 16:11–23.
[13] Pl.'s Pre-Trial Br. at 9.
[14] *Id.*

investor group and orally proposed an offer of $38 per share, but he ultimately declined to make a formal offer.[15] Although Cooper informed Chengshan Group, as its joint venture partner, that Apollo had approached Cooper about an acquisition, Apollo was never informed that Chengshan Group had expressed an interest in acquiring Cooper.[16]

On June 12, 2013, Apollo and Cooper entered into the Merger Agreement, whereby Apollo agreed to acquire all outstanding Cooper shares for $35 per share, representing a 40% premium over trading prices and a total transaction value of roughly $2.5 billion.[17] On September 30, approximately 74% of Cooper's outstanding shares voted in support of the merger.[18] Had the deal closed, the resulting entity would have been the seventh largest tire manufacturer in the world.[19]

B. *The CCT Strike*

As noted above, Cooper and Apollo entered into the Merger Agreement on June 12, 2013. After the transaction was announced, Apollo's stock price dropped

---

[15] Trial Tr. 32:1–33:21 (Armes); *see also* JX 1 ("Prior to the signing of the merger agreement, Chengshan Group Chairman Che Hongzhi was given the opportunity to bid for Cooper. Chengshan Group was fully supported in the process. Chengshan Group was given access to Cooper's data room, and Cooper CEO Roy Armes made multiple trips to Beijing to meet with Che and his advisors. However, Chengshan Group ultimately did not make a formal bid."); Armes Dep. Tr. 15:15–20.

[16] Trial Tr. 91:3–19 (Armes); *id.* at 560:15–562:2 (Kanwar).

[17] Compl. ¶ 2.

[18] *Id.* ¶ 123.

[19] *Id.* ¶ 2.

by 39%.[20]  Research analysts speculated that the acquisition was too highly leveraged and provided few synergies for Apollo.[21]  In addition, the labor union at CCT, Cooper's Chinese joint venture, openly criticized the merger as too highly leveraged,[22] publishing a paid advertisement in the *Wall Street Journal* denouncing the merger.[23]  On June 21, 2013, the CCT labor union went on strike.[24]  The union returned to work on June 28, 2013, but resumed the strike again on or around July 12, 2013.[25]

On August 17, the CCT union again resumed work at the plant, but refused to produce Cooper-branded tires.[26]  In addition, "the union . . . physically barr[ed] certain Cooper-appointed managers from accessing CCT's facility or from obtaining certain of CCT's financial books and records, and . . . prevented CCT from entering certain operating and financial data into CCT's computer systems."[27]

---

[20] *Id.* ¶ 54.

[21] *Id.* ¶ 55.

[22] *Id.* ¶ 57.

[23] JX 70.

[24] Compl. ¶ 58.

[25] *Id.* ¶¶ 58, 63.

[26] *Id.* ¶ 67; *see also* Trial Tr. 51:16–20 (Armes) ("The financial data is not being uploaded like we would normally do.  The production does continue, but they are not producing Cooper-branded products.  And they're restricting the access of our people into the plant.").

[27] Compl. ¶ 67; *see also* JX 584 at COOPER0073766 ("The union has prevented Cooper and others from entering the factory to retrieve their property, and we have recently been told that Cooper-affiliated management will be prohibited from entering their offices beginning on August 12."); JX 252 at COOPER0037907 ("We have and will continue to supply you with reasonable access to information.  As a result of the announcement of the merger, however, the union and our partner at CCT have taken actions to limit our access to the plant, including limiting access to certain books and records.  You know that already."); JX 620 at APOLLO_00006337 (noting that Cooper's visibility into CCT was largely limited "to what raw

The union's reaction to news of the merger was unprecedented,[28] and in an effort to hold up production and force an end to the "strike"—in actuality, the physical exclusion of Cooper from its subsidiary—Cooper management adopted a policy of suspending payments to suppliers who continued to ship supplies during the pendency of the strike.[29] Cooper also floated "potential plans . . . to change the security firm at the CCT site"—*i.e.*, to physically replace security guards with their own men—but Apollo rejected this idea due to "concern[s] for personal safety of the people at and near the plant."[30]

---

material inventory is entering the plant"); JX 255 at GPC014773 ("[W]hile the suggestion that [Apollo] show up at CCT to attempt access appeared perplexing, I want you to know that as soon as you have enough access or control at CCT to allow us access we will have people on the next available flights . . . .").

[28] Cooper CEO Roy Armes testified at trial that during his tenure at Cooper, the CCT union had never gone on strike and had never blocked management from CCT facilities. Trial Tr. 52:3–20.

[29] *Id.* at 278:9–12 (Hughes). On September 25, 2013, the General Manager of Cooper's Asia Operations, Allen Tsaur, sent an email to the President of Cooper's International Tire Division, Hal Miller, which Mr. Miller subsequently forwarded to Cooper CEO Roy Armes and General Counsel Steven Zamansky, summarizing the anticipated consequences of Cooper's plan to cut off payment to CCT's suppliers as follows:

- OE customers are likely to sue CCT for contract violation and lost time penalty. Please note that CCT supplies to all top 5 truck companies in China.
- The raw material payment of 40M RMB is not all for new purchase. Some are for goods already received. Along with our suppliers, they are likely to sue CCT for delinquency.
- Many suppliers are in CCT Purchasing Department office everyday demanding payment.
- CCT is likely to lose in the lawsuits for contract violation and lost time penalty to OE and delinquency for suppliers. The consequence can be very bad as not only we need to pay [sic] but also ruin the creditability. CCT will need to buy on cash in the future.

JX 445 at COOPER0033397.

[30] JX 292.

Although the parties initially believed that the strike in China was instigated by CCT's labor union, Apollo contends that, upon hiring a private investigator to interview employees at CCT, it uncovered that the true cause of the strike at CCT was Chairman Che, who had instructed middle management to warn workers that "anyone that does not take part in the protest will be fired."[31] This news came as a surprise to both Cooper and Apollo, who anticipated in diligence that Chairman Che might disfavor the merger,[32] but had met together with Chairman Che prior to

---

[31] JX 357; *see also* JX 584 at COOPER0073766 ("A number of workers attempted to return to work on August 5, but union representatives and security blocked the entrance to the factory and prevented them from returning."); JX 76 ("It seems that the workers interviewed clearly know the agenda behind the protest. According to them, it is Che Hongzhi that instigated the protest.").

[32] *See* Trial Tr. 19:16–20:7 (Armes) ("As we were talking about a lot of business things as I indicated before, Chengshan or CCT came up because there was concern from Apollo about how the Chairman Che would react to this acquisition. And as I recall, I mentioned to Apollo there could be one of three things that he could do: One, he could go along with the acquisition and really support it and transition it. Second, he could possibly offer up his shares. He has 35 percent in the joint venture. He could possibly be looking for selling those. And then, thirdly, he could—he could disrupt it or try to undermine it. And as we talked back and forth, later on there was a fourth one that came up that basically he may try to put his own bid together. We just weren't sure."). *But see id.* at 87:13–88:4 (Armes) ("Q. Now, you testified on your direct that you told Apollo that he would -- that Che might do something to undermine the situation. I think that was your language. Correct me if I'm wrong. A. Mm-hmm. Q. You didn't tell him, though, that that was a likely situation, though, did you? A. No. I didn't feel that it was a likely situation. Q. If fact, you thought from all indications that he would support the transaction. A. Yes, all our indications was that. Q. In fact, after the first problems surfaced at CCT, you told your board that it was very unexpected to you, didn't you? A. Yes."); *id.* at 270:8–11 (Hughes) ("Q. And Apollo was never told during the merger negotiations that it was likely that there would be disruption at CCT, was it? A. Not in a discussion I was present at."); *id.* at 557:19–558:1 (Kanwar) ("Q. Is it your perception that the chairman has taken over CCT? A. Yes. Q. In the premerger agreement meetings with the folks at Cooper, did anybody suggest to you that anything like that was going to happen? A. No.").

signing the Merger Agreement,[33] and had understood that as the owner of a 35% interest, "[f]rom a technical point of view, [Chengshan Group had] no veto or put rights, so [Cooper did] not need their approval for the deal."[34]

Information that Chairman Che was behind the strike at CCT incited Apollo's "Project Charlie," a codename Apollo used in reference to its efforts at negotiations and relationship-building with Chairman Che.[35] Although Cooper representatives initially sought to resolve the conflict without Apollo's direct involvement,[36] on September 2, 2013, Apollo also sent a letter to Chairman Che

---

[33] *See id.* at 459:7–12 (Zamansky) ("It was consistent that the meeting went well, that there was some relationship building to do; but [Chairman Che] didn't raise any concerns other than saying that we have some relationship building to do, but it went well and we're moving forward.").

[34] JX 18; *see also* Trial Tr. 21:1–5 (Armes) ("Q. Did—before March 7th did Chairman Che ever tell you that he would derail any deal that Cooper was a part of? A. There was no indication of that at all."); JX 52 at 7 (identifying, in due diligence summary materials, change in control provisions in the CCT joint venture agreement that could trigger Chengshan Group's right of first refusal, but determining that "these provisions are unlikely to be triggered by an indirect change of control such as that associated with the Proposed Transaction"); JX 584 at COOPER0073765 ("Weeks prior to the signing of the merger deal with Apollo, Cooper asked Che for his support of the deal and Che did nothing to indicate that there would be a strike if the Apollo deal went forward.").

[35] *See, e.g.*, JX 75 (describing, in a summary of meetings with Chengshan Group, the reaction to the merger at CCT as "very strong and somewhat irrational," and noting that "[t]his challenge will take a 'creative' solution to resolve the union's concerns in this situation"); JX 584 at COOPER0073766 ("It is unclear why Chairman Che would want to dissolve a company that is profitable, employs a sizeable work force, and brings prosperity to the local community, by first advocating a strike and then using the strike as grounds for dissolving the company."); JX 76 ("It seems that the workers interviewed clearly know the agenda behind the protest. According to them, it is Che Hongzhi that instigated the protest. . . . The workers interviewed said they personally have no concerns over the acquisition."); JX 153 at GPC01602 (providing an overview of "Project Charlie," and indicating the unusual position that Chengshan Group held a "35% minority stake in unlisted subsidiary, with limited rights (however effective management control)").

[36] *See generally* JX 86 (summarizing a July 10, 2013 meeting between Cooper representatives and Chairman Che).

indicating that, despite disruptions at CCT, Apollo still planned to consummate the merger with Cooper, and explaining that, "[a]s I am sure you are aware, the opposition will not prevent the merger from going ahead as planned, for legal and commercial reasons."[37] Apollo likewise indicated by letter to the Mayor of Rongcheng, China, that both Cooper and Apollo "are legally committed, under United States and international laws, to proceed with the merger."[38]

However, despite Apollo's assurances that it stood behind the merger, Cooper contends that the strike at CCT "soured Apollo on the Merger,"[39] and that Apollo subsequently "began to look for some other pretext for seeking to escape what it now perceive[d] as a bad deal, either by delaying the closing long enough so that the risk relating to CCT shift[ed] to Cooper, or by obtaining leverage to renegotiate the Merger consideration downward."[40]

C. *The USW Strike*

In addition to the strike at CCT, Cooper's domestic union, the USW, reacted to the merger announcement by filing grievances against Cooper, claiming that the proposed merger violated Cooper's collective bargaining agreements governing its Findlay, Ohio and Texarkana, Arkansas plants; the USW argued that those agreements prevented Cooper from selling its plants prior to a renegotiation of the

---

[37] JX 4.
[38] JX 151 at APOLLO_00005514.
[39] Compl. ¶ 69.
[40] *Id.* ¶ 71.

14

collective bargaining agreements between a buyer and the union.[41]   During the diligence and negotiation process, Cooper and Apollo anticipated what response the merger announcement would likely generate, including the likelihood that the USW would invoke the renegotiation provisions.[42]   However, Cooper's management believed—and indicated to Apollo—that the odds of Cooper receiving a favorable outcome at arbitration were quite high.[43]   As a result, with Apollo's approval, Cooper submitted the USW's grievances to binding arbitration, with proceedings held on August 28 and 29, 2013.[44]   To the surprise of Cooper and Apollo, the arbitrator issued a decision in favor of the USW, determining that the merger could not close prior to a successful negotiation between Apollo and the USW.   Rather than permitting the arbitrator's ruling to become a court order enjoining the transaction, on September 25, Apollo, Cooper, and the USW entered into an agreement providing that the merger "shall not close unless an agreement has been entered into in satisfaction of the Opinion and Award issued by [the arbitrator] on terms acceptable to [the USW]."[45]

---

[41] *Id.* ¶ 72.

[42] *Id.* ¶ 73.

[43] Cooper's General Counsel Steve Zamansky relayed to Apollo that outside counsel put the likelihood of success in the range of 60%–95%, though he expressed his disagreement that the odds were as high as 95%.   Trial Tr. 534:9–535:22 (Zamansky).   Cooper's CEO Roy Armes indicated that he communicated to Apollo a success rate in the range of 80%–85%.   *Id.* at 105:24–106:2 (Armes).

[44] Compl. ¶ 76.

[45] Defs.' Answer and Countercl. Ex. A; JX 248.

On September 7, 2013, immediately after the arbitration decision was issued, representatives from Cooper and Apollo met in New York to develop a negotiating strategy. On September 19 and 20, Apollo met with USW representatives in Nashville, Tennessee. On September 23, Apollo requested supplemental information from Cooper in order to learn more about the concessions Cooper had encouraged Apollo to make with the USW.[46] Apollo's Vice Chairman and Cooper's CEO spoke on September 27, and Apollo again met with the USW on September 25 and 26, and on October 1 and 2, in Pittsburgh, Pennsylvania. Throughout these meetings, Apollo prevented Cooper from participating because, according to Apollo, Cooper had historically maintained strained relationships with its labor unions and Apollo wished to rebuild relationships with Cooper's unions.[47] At the same time, Apollo requested that Cooper agree to a price reduction, as concessions to the USW would be costly. Cooper rejected Apollo's request for a price adjustment, and in an effort to speed up negotiations between Apollo and the USW, in November 2013, Cooper independently negotiated a conditional agreement with the USW, which guaranteed the union certain benefits in the event the merger did not close.

---

[46] JX 242.

[47] Defs.' Countercl. ¶ 34. On the other hand, Cooper has pointed out that Apollo lost significant negotiating leverage by refusing to permit Cooper to negotiate with the USW, since Cooper was ultimately able to work out a deal with the USW that included contingent terms in the event that the merger did not close, while such a strategy was not available without Cooper's presence. *See* Trial Tr. 386:21–392:20 (Weiner).

The merger, by its terms, had to close no later than December 31, 2013.[48]

Notwithstanding that "Outside Date," Cooper needed to close the transaction by mid-November 2013 because it would otherwise be required to provide its third quarter financial information as a condition to financing, which it could not do in light of its exclusion from the CCT facility and documents therein.[49]

D. *Procedural History*

Cooper filed its Complaint in this action on October 4, 2013, seeking (1) a positive injunction requiring Apollo to (a) use its reasonable best efforts to resolve any disagreements with the USW by permitting Cooper to negotiate in Apollo's stead, and subsequently approving a commercially reasonable agreement negotiated by Cooper, and (b) consummate the Merger; (2) a declaration that, apart from Apollo's obligation to use best efforts to reach an agreement with the USW, all conditions to closing had been satisfied; and, in the alternative, (3) unspecified money damages to compensate Cooper for losses it incurred due to Apollo's alleged breach of the Merger Agreement. In response, Apollo brought a counterclaim seeking a declaration that conditions precedent to closing had not been satisfied. The matter was expedited because Cooper, as described above, knew it would not be able to satisfy a contractual condition after mid-November.

---

[48] JX 65 ("Merger Agreement") § 8.1(b)(i).
[49] Compl. ¶¶ 42, 67, 128.

I held a three-day trial from November 5–7, 2013, in which the parties presented evidence on whether Apollo was in material breach of the Merger Agreement by failing to use its reasonable best efforts to negotiate with the USW, and whether all conditions precedent to closing had otherwise been satisfied. At that time, Cooper sought specific performance of the Merger Agreement, and represented that, because it was vanishingly unlikely due to the strike at CCT that Cooper would be able to deliver third quarter financials to Apollo's financing sources by November 14, 2013, as required by the Merger Agreement, any injunctive relief, to be meaningful, would have to be granted by that date. As a result, on November 8, I delivered a bench decision, supplemented on November 9 by a letter opinion, on a single dispositive issue—whether Cooper was entitled to injunctive relief, and ultimately specific performance of the Merger Agreement, because Apollo had materially breached the Agreement by failing to use its reasonable best efforts to negotiate a resolution with the USW. In those USW Opinions, I found that Apollo was not in breach and that Cooper was not entitled to the relief it sought.[50]

At Cooper's request, I then certified an interlocutory appeal, with the understanding that Monday, November 11 was a holiday, and that Cooper would

---

[50] *See Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, C.A. No. 8980-VCG, at 998:24–1012:9 (Del. Ch. Nov. 8, 2013) (TRANSCRIPT); *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, C.A. No. 8980-VCG (Del. Ch. Nov. 9, 2013).

18

be denied meaningful access to an appeal if it could not receive a decision on its appeal by November 14, while specific performance of the Merger Agreement—that is, while delivery of Cooper's current financial information—was still possible. Instead, after I certified the interlocutory appeal, Cooper represented in its application to the Supreme Court that it sought recovery of the Reverse Termination Fee under the Merger Agreement rather than injunctive relief, and therefore the timeline under which this Court had accommodated the parties was no longer applicable. The Supreme Court dismissed Cooper's appeal on December 16, 2013 as "improvidently accepted."[51]

That same day, in an effort to prevent Cooper from pursuing the Reverse Termination Fee it now sought, Apollo moved for a temporary restraining order preventing Cooper from drawing on the letter of credit for the Reverse Termination Fee, and a judicial declaration that Cooper had not satisfied all conditions to closing prior to trial. On January 24, 2014, the parties submitted written argument regarding how this case should move forward. Despite Cooper's request that I convert my November 8 bench ruling into a final judgment on Apollo's counterclaim, I determined on January 27, 2014 that Apollo's Motion for Entry of

---

[51] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, C.A No. 624, 2013 (Del. Dec. 16, 2013) (ORDER).

a Declaratory Judgment should be resolved before a final judgment is entered.[52]  I

heard oral argument on that Motion on July 9, 2014.

E. *Conditions to Closing*

Apollo argues, and requests a judicial declaration stating, that "the

conditions to closing had not been satisfied prior to the trial of this action, and

Cooper [was], thus, not in a position to close the merger."[53]  Specifically, Apollo

contends that: (1) the 20-day Marketing Period has not taken place;[54] and (2)

certain of Apollo's Section 7.2 conditions to closing have not been satisfied,

including that (a) a Material Adverse Effect has taken place; (b) Cooper has not

satisfied all of its covenants and agreements under Article V of the Merger

---

[52] *See Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd*., C.A. No. 8980-VCG (Del. Ch. Jan. 27, 2014).

[53] Defs.' Mot. for Declaratory J. at 1.  It is clear that in the present action Apollo seeks a declaratory judgment that would effectively prevent Cooper from pursuing the Reverse Termination Fee under the Merger Agreement.  *See* Defs.' Br. in Support of Mot. for TRO and Declaratory J. at 12 ("Cooper informed the Supreme Court by letter . . . that, instead of seeking to *prevent* the termination of the Merger Agreement, Cooper was now 'consider[ing]' terminating the Merger Agreement itself 'to protect [its] rights under the letter of credit securing the reverse termination fee.'  A few hours after Cooper's revelation, the Supreme Court dismissed the interlocutory appeal as improvidently granted.  Apollo now brings the present motion to prevent Cooper from continuing with its scheme to obtain a termination fee to which it is not entitled." (alterations in original) (citations omitted)).  While my declaration as to whether Cooper satisfied all conditions to closing prior to trial will likely be dispositive of Cooper's ability to recover the Reverse Termination Fee, *see* Merger Agreement §§ 8.2(c), 8.1(g), my ruling here is necessarily limited to consideration of the conditions to closing, and not whether Cooper is entitled to the Reverse Termination Fee.

[54] Apollo contends that the occurrence of the Marketing Period, although not an Article VII condition to closing, is necessary for the merger to close according to Section 1.2.  Thus, I list it among the "conditions to closing" that Apollo seeks to have evaluated in its Motion for Entry of Declaratory Judgment.  However, as detailed below, my decision does not rely on this issue, and thus I do not find it necessary to determine whether the Marketing Period must occur as a condition to closing or merely as a condition to Cooper's entitlement to the Reverse Termination Fee under Section 8.1(g).

Agreement; and (c) Cooper was in breach of certain of its representations and warranties under Article VI of the Merger Agreement. In order for Apollo to prevail on its Motion, only one of these contentions must be true. Consequently, in my subsequent analysis on the issues, I primarily discuss Cooper's breach of its obligation to operate its, and its subsidiaries', business in the ordinary course during the pendency of the merger—a covenant under Article V. My finding on that issue is sufficient to resolve the issues remaining before me. For the sake of completeness, however, all of Apollo's contentions are set out in full below, together with the contractual provisions sufficient to understand them.

1. <u>Marketing Period</u>

Although not contingent on financing, the Merger Agreement provides for the occurrence of a 20-day Marketing Period, during which Apollo's financing banks can market the debt by which Apollo hoped to finance the merger. Apollo planned to finance the transaction with a combination of equity and a debt offering underwritten by Morgan Stanley, Deutsche Bank, Goldman Sachs, and Standard Chartered Bank; in the event that a debt offering was unsuccessful, the financing banks would extend a temporary bridge loan until the debt could be sold. The Merger Agreement therefore provides that:

> The closing of the Merger (the "Closing") shall take place at 10:00 am on the fourth Business Day after the satisfaction or waiver of all of the conditions (other than any condition that by its nature cannot be satisfied until the Closing, but subject to satisfaction of any such

condition) set forth in ARROW VII (the "Closing Date") . . . provided that if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in ARTICLE VII . . . then, subject to the satisfaction or waiver of the conditions set forth in ARTICLE VII at such time, the Closing shall occur instead on the earlier of (a) any Business Day during the Marketing Period as may be specified by [Apollo] on no less than three (3) Business Days' prior written notice to [Cooper] and (b) three (3) Business Days after the final day of the Marketing Period.[55]

"Marketing Period" is defined in Section 10.2 as "the first period of 20 consecutive Business Days after the date of this Agreement throughout which [Apollo] shall have the Required Information [Cooper] is required to provide pursuant to Section 6.11 and such Required Information is Compliant;" however, "the Marketing Period shall not commence and shall be deemed not to have commenced (i) prior to the mailing of the Proxy Statement."[56] Section 6.11(e)(i) defines "Required Information" as:

(A) [F]inancial statements, financial data and other pertinent information regarding [Cooper] and its Subsidiaries of the type required by SEC Regulation S-X and SEC Regulation S-K under the Securities Act (excluding pro forma financial statements, pro forma adjustments and information relating specifically to the Financing (other than historical information relating to [Cooper] and its Subsidiaries and forward looking information regarding [Cooper] and its Subsidiaries otherwise required by applicable Law)) and (B) information relating to [Cooper] and its Subsidiaries (including information to be used in the preparation of one or more information packages (including customary confidential information, memoranda, offering circulars or prospectuses) regarding the business, operations and business plan or budget of [Cooper] and its Subsidiaries)

---

[55] Merger Agreement § 1.2 (typeface altered from original).
[56] *Id.* § 10.2 ("Marketing Period").

customary for the placement, arrangement and/or syndication of loans as contemplated by the Financing Documents, to the extent reasonably requested by [Apollo] to assist in preparation of customary offering or information documents or rating agency or lender or investor presentations relating to such placement, arrangement and/or syndication of loans; provided, that any memoranda or prospectuses need not be issued by [Cooper] or any of its Affiliates . . . .[57]

Further, under the terms of the Merger Agreement, Required Information is

"Compliant" if:

(a) [S]uch Required Information does not contain any untrue statement of a material fact or omit to state any material fact, in each case with respect to [Cooper] and its Subsidiaries, necessary in order to make the statements contained in such Required Information, in the context in which they are made, not misleading;

(b) [S]uch Required Information is, and remains throughout the Marketing Period, compliant in all material respects with all applicable requirements of Regulation S-K and Regulation S-X under the Securities Act (excluding information required by Rule 3-09, Rule 3-10 or Rule 3-16 or Regulation S-X or Compensation Disclosure and Analysis required by Regulation S-K Item 402(b));

(c) [Cooper's] auditors have not withdrawn any audit opinion with respect to any financial statements contained in the Required Information;

(d) [Cooper's] auditors have delivered drafts of customary comfort letters, including customary negative assurance comfort with respect to periods following the end of the latest fiscal year or fiscal quarter for which historical financial statements are included in the Required Information, and such auditors have confirmed they are prepared to issue any such comfort letter upon any pricing date occurring during the Marketing Period; and

---

[57] *Id.* § 6.11(e)(i).

(e) [T]he financial statements in such Required Information are, and remain throughout the Marketing Period, sufficiently current to permit a registration statement on Form S-1 using such financial statements to be declared effective by the SEC on or before the last day of the Marketing Period.[58]

If at any point within that 20-day Marketing Period the Required Information is no longer Compliant, "a new 20 Business Day period shall commence upon [Apollo] and its Financing Sources receiving updated Required Information that would be Compliant."[59]

Cooper notified Apollo on September 3, 2013 that Cooper believed the 20-day Marketing Period anticipated in Section 1.2 of the Merger Agreement had begun, as, according to Cooper, all Required Information had been delivered and was Compliant since August 30.[60] On August 30, Cooper had provided Apollo with (1) a draft offering memorandum incorporating Cooper's most recent 10-K and 10-Q; (2) an updated business plan; (3) historical information regarding Cooper's financials for the prior three years; and (4) a draft comfort letter from Ernst & Young. With respect to the updated business plan, Cooper CFO Brad Hughes acknowledged in two separate emails that the operating profit projection in that plan was "very fluid . . . given the lack of clarity about what is going on at

---

[58] *Id.* § 10.2 ("Compliant").
[59] *Id.* ("Marketing Period").
[60] JX 161.

24

CCT,"[61] and that information related to CCT's business was only "directional at this point."[62] Nevertheless, Cooper claims that the business plans it provided on August 30 were Compliant, as defined in Section 10.2 of the Merger Agreement.

By contrast, Apollo contends that any Required Information provided by Cooper prior to September 3 was not Compliant, as Cooper failed to (1) deliver accurate business plans relating to CCT, or (2) deliver a final, as opposed to draft, "customary comfort letter" providing "customary negative assurance comfort."[63] In fact, on September 5, Apollo responded to Cooper's notification that the Marketing Period had begun, taking the position that "[w]e do not believe that the Company has completed the delivery of Required Information that is Compliant,"[64] and noting that Apollo was continuing to work with Cooper representatives to obtain Required Information, including a revised business plan that addressed developments at CCT, to "be finalized shortly after the Company's financial information for August is available."[65]

---

[61] JX 399.

[62] JX 199. As of September 15, 2013, Cooper could provide only estimated financials for the month of August. JX 219.

[63] See Defs.' Pre-Trial Br. at 26–27, 45–47. Notably, the parties do not argue that, during the 20-day period in which Cooper alleges the Marketing Period occurred, the Required Information was insufficient under federal securities laws.

[64] JX 186.

[65] Id.

2. Material Adverse Effect

Section 7.2(c) of the Merger Agreement conditions Apollo's obligation to close the transaction on the non-occurrence of a Material Adverse Effect. Section 10.2 defines "Material Adverse Effect" as:

> any fact, circumstance, event, change, effect or occurrence that (i) has had or would reasonably be expected to have a material adverse effect on the business, results of operations or financial condition of [Cooper], its Subsidiaries and Joint Ventures, taken as a whole . . . or (ii) that would reasonably be expected to prevent or materially delay or impair the ability of [Cooper] to perform its obligations under this Agreement or to consummate the Transactions.[66]

Further, subsection (i) to that definition carves out several circumstances that do not constitute Material Adverse Effects, including those attributable to

> (F) the execution and delivery of this Agreement or the public announcement or pendency of the Merger or any of the other Transactions or the Financing, including the impact thereof on the relationships, contractual or otherwise, of the Company or any of its Subsidiaries with employees, labor unions, customers, suppliers or partners, and any litigation arising from allegations of any breach of fiduciary duty or violation of Law relating to this Agreement or the transactions contemplated by this Agreement, or compliance by the Company with the terms of this Agreement . . . .[67]

Apollo argues that an event falling under the carveout of subsection (i)(F) is not foreclosed from constituting a Material Adverse Effect under subsection (ii), however. Specifically, Apollo argues that the lockout at CCT was not contemplated by the parties, prevented Cooper from satisfying its obligations under

---

[66] Merger Agreement § 10.2 ("Material Adverse Effect").
[67] *Id.* § 10.2 ("Material Adverse Effect," (i)(F)).

26

the Merger Agreement, and therefore constituted a Material Adverse Effect under subsection (ii).

Despite that contention, James Dougherty, Cooper's corporate counsel at Jones Day, testified at trial that Cooper communicated from the outset that its goals in negotiating the Merger Agreement were to secure maximum deal and financing certainty, and for the deal to close as quickly as possible.[68] According to Dougherty, Cooper believed it was wholly allocating to Apollo the risk that tensions between Cooper and its subsidiaries and joint venture partners would arise.[69] Cooper therefore contends that the definition of Material Adverse Effect evidences the parties' intent to prevent Apollo from avoiding its obligation to close for any reason attributable to the merger announcement's impact on Cooper's relationships with its subsidiaries or joint venture partners.

### 3. Covenants and Agreements as Conditions to Closing

In addition, as outlined in Section 7.2(b) of the Merger Agreement, Apollo's obligation to close the transaction is conditioned on the satisfaction of several covenants and agreements. That Section provides:

> The obligation of [Apollo] to effect the Merger is further subject to the satisfaction, or waiver by [Apollo], at or prior to the Effective Time of the following conditions:
> . . . .

---

[68] Trial Tr. 143:18–144:14 (Dougherty).
[69] *Id.* at 147:3–153:3.

(b) [Cooper] shall have in all material respects performed or complied with the covenants and agreements contained in this Agreement to be performed or complied with by it prior to or on the Closing Date.[70]

Article V sets out the covenants to which the parties agreed, including Section 5.1(a), which states:

From the date of this Agreement and until the Effective Time or the earlier termination of this Agreement in accordance with its terms, except as (w) otherwise expressly contemplated by this Agreement . . . [Cooper] shall, and shall cause each of its Subsidiaries to, conduct its business in the ordinary course of business consistent with past practice and in compliance in all material respects with all material applicable Laws, and shall, and shall cause each of its Subsidiaries to, use its commercially reasonable efforts to preserve intact its present business organization, keep available the services of its directors, officers and employees and maintain existing relations and goodwill with customers, distributors, lenders, partners, suppliers and others having material business associations with it or its Subsidiaries.[71]

Apollo argues that the takeover at CCT amounted to a breach of Cooper's covenant to maintain its interim operations under Section 5.1(a).

Apollo further argues that Cooper has breached Sections 6.11 and 6.5, and therefore has failed to satisfy conditions to closing under Section 7.2(b). Section 6.11(e) requires that, "[p]rior to the Closing Date, [Cooper] shall use reasonable best efforts to provide and to cause its Subsidiaries and Representatives, including legal, finance and accounting, to provide, to [Apollo], at [Apollo's] sole expense,

---

[70] Merger Agreement § 7.2.
[71] *Id.* § 5.1(a).

28

all cooperation reasonably requested by [Apollo] that is customary in connection with the arrangement of the Financing."[72]   Section 6.5 states:

> Subject to the Confidentiality Agreement and applicable Law relating to the sharing of information, [Cooper] agrees to provide, and shall cause its Subsidiaries to provide, [Apollo] and its Representatives, from time to time prior to the earlier of the Effective Time or the termination of this Agreement, reasonable access during normal business hours to (i) [Cooper's] and its Subsidiaries' respective properties, books, Contracts, commitments, personnel and records and (ii) such other information as [Apollo] shall reasonably request with respect to [Cooper] and its Subsidiaries and their respective businesses, financial condition and operations, in each case, to the extent related to consummation of the Transactions or the ownership or operation of the respective businesses of [Cooper] and its Subsidiaries from and after Closing . . . .[73]

### 4. Representations and Warranties as Conditions to Closing

Finally, Section 7.2(a) provides that Apollo's obligation to close is subject to the accuracy of certain representations and warranties.  Section 7.2(a) states:

> The representations and warranties of [Cooper] set forth herein shall be true and correct in all respects (without giving effect to any materiality or "Material Adverse Effect" qualifications contained therein) both when made and at and as of the Closing Date, as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such earlier date), except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have or result in, individually or in the aggregate, a Material Adverse Effect . . . .[74]

---

[72] *Id.* § 6.11(e).
[73] *Id.* § 6.5.
[74] *Id.* § 7.2(a).

Apollo points to four representations and warranties that Cooper has purportedly breached. First, Section 3.5(d) represents that Cooper "maintains internal control over financial reporting," and that "[s]uch internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."[75] Second, Section 3.6 represents that "[s]ince December 31, 2012, except as otherwise required or contemplated by this Agreement, [Cooper], its Subsidiaries and, to the Knowledge of [Cooper], its Joint Ventures have conducted their respective businesses only in the ordinary course of business consistent with past practice in all material respects."[76] Third, Section 3.13 represents that:

> [Cooper] or any of its Subsidiaries [are not] the subject of any material Action that asserts that [Cooper] or any of its Subsidiaries has committed an unfair labor practice or that seeks to compel it to bargain with any labor union or labor organization, nor is there pending or, to the Knowledge of [Cooper], threatened, nor has there been for the past five years, any labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving [Cooper] or any of its Subsidiaries.[77]

Finally, Section 3.14(b) represents that, "[e]xcept as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, [Cooper] or one of its Subsidiaries has exclusive possession of each Owned Real

---

[75] *Id.* § 3.5(d).
[76] *Id.* § 3.6.
[77] *Id.* § 3.13.

Property and Leased Real Property."[78] Apollo contends that the lockout at CCT, and the resulting inability of Cooper's management to obtain CCT financial records, have caused Cooper to breach each of these representations.

## III. ANALYSIS

### A. *The Issues Presented*

In the analysis below, I find that, due to the CCT strike and physical takeover of the CCT facility, apparently orchestrated by Chairman Che, and due to Cooper's reaction to that takeover, which involved an effort to cut off supply from third-party contractors to CCT, Cooper failed to comply with Section 5.1(a) of the Merger Agreement, which required Cooper to "cause each of its subsidiaries to conduct its business in the ordinary course of business." Compliance with Section 5.1(a) had a cascade effect on other contractual provisions, including those involving Material Adverse Effects and the Marketing Period. For purposes of this Memorandum Opinion, however, because Cooper's failure to comply with Section 5.1(a) is sufficient to grant the declaratory judgment Apollo seeks here, I confine my analysis to that issue only.

As described above, pursuant to Section 7.2(b) of the Merger Agreement, Apollo's obligation to close was conditioned on Cooper's fulfillment of certain

---

[78] *Id.* § 3.14(b).

31

covenants and agreements contained in Article V of the Merger Agreement. Section 5.1(a) sets out one such covenant:

> From the date of this Agreement and until the Effective Time or the earlier termination of this Agreement in accordance with its terms, except as (w) otherwise expressly contemplated by this Agreement . . . [Cooper] shall, and shall cause each of its Subsidiaries to, conduct its business in the ordinary course of business consistent with past practice and in compliance in all material respects with all material applicable Laws, and shall, and shall cause each of its Subsidiaries to, use its commercially reasonable efforts to preserve intact its present business organization, keep available the services of its directors, officers and employees and maintain existing relations and goodwill with customers, distributors, lenders, partners, suppliers and others having material business associations with it or its Subsidiaries.[79]

Apollo contends that Cooper has failed to cause CCT to "conduct its business in the ordinary course of business consistent with past practice," or to "use its commercially reasonable efforts to preserve intact its present business organization, keep available the services of its directors, officers and employees and maintain existing relations and goodwill with customers, distributors, lenders, partners, suppliers and others having material business associations with it or its Subsidiaries." I address those contentions below.

B. *Apollo Did Not Acquiesce in Any Breach of the Merger Agreement*

Preliminarily, Cooper contends that Apollo should be estopped from challenging Cooper's failure to fulfill any covenants as a result of the lockout at CCT because Apollo participated in, or acquiesced to, attempts to resolve the

---

[79] *Id.* § 5.1(a).

disruption, and in the process represented that it was bound to close the transaction by the Merger Agreement. Among other things, Cooper suggests that the following factors demonstrate Apollo's "participat[ion] in the situation about which it now complains"[80]: (i) Apollo's statements to Chairman Che and the Mayor of Rongcheng indicating that it was required by the Merger Agreement to close the transaction; (ii) Apollo's rejection of Cooper's proposal to "replac[e] the CCT security personnel [physically] blocking Cooper's representatives from the CCT facility;"[81] (iii) communications that, according to Cooper, indicate that Apollo "took responsibility for negotiating a resolution with Che;"[82] and (iv) Apollo's attempts throughout "Project Charlie" to negotiate a buyout of Che's 35% interest in CCT, which, according to Cooper, "provided [Che] an incentive to hold out for more—*i.e.*, to *continue* the disruptions until Apollo increased its offer to one that [Che] found acceptable."[83] Cooper contends that, "[u]nder such circumstances, it would be unfair and inequitable to allow Apollo to claim that Cooper somehow violated its covenants by failing to resolve the CCT disruptions."[84]

---

[80] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 28.
[81] *Id.* at 30.
[82] *Id.* at 29.
[83] *Id.* at 30–31.
[84] *Id.* at 31 (emphasis omitted).

33

Acquiescence in another party's conduct, under certain circumstances, may give rise to estoppel.[85] In Delaware, as a general rule, "one who participates or acquiesces in another's conduct has no standing in equity to complain against it."[86] As our Supreme Court recently explained, a claimant acquiesces in an act where he:

> has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[87]

For the reasons explained below, I find that, despite statements indicating that the transaction would close, and its cooperation with Cooper in attempting to resolve the lockout at CCT, Apollo did not participate or acquiesce in any breach of the terms of the Merger Agreement arising from the lockout, and is therefore not estopped from alleging such a breach.

Although Cooper seeks to prevent Apollo from challenging any breach caused by Chairman Che's seizure of CCT, Cooper does not, and cannot, contend

---

[85] *Council of S. Bethany v. Sandpiper Dev. Corp., Inc.*, 1986 WL 13707, at *4 (Del. Ch. Dec. 8, 1986).

[86] *Id.*; *see also Gottlieb v. McKee*, 107 A.2d 240, 244 (Del. Ch. 1954) ("The rule is a general one that he who participates in or acquiesces in an action has no standing in a court of equity to complain against it. Equity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits."); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. 1937).

[87] *Klaassen v. Allegro Dev. Corp.*, 2014 WL 996375, at *8 (Del. Mar. 14, 2014) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998), and *The NTC Group, Inc. v. West Point–Pepperell, Inc.,* 1990 WL 143842, at *5 (Del. Ch. Oct. 17, 1990)).

that Apollo incited, supported, or actively furthered the lockout at CCT. The evidence on which Cooper now relies does not demonstrate that Apollo actively impeded, directed, or even approved of Cooper's attempts to resolve the situation at CCT such that Apollo must now be prohibited in equity or law from challenging Cooper's fulfillment of its covenants. For example, Apollo's attempts to buy out Chairman Che's interest in CCT, and its rejection of Cooper's proposal to send in its own security personnel "to attempt to regain control by force,"[88] do not demonstrate participation in the lockout; instead, those acts demonstrate simply that Apollo took reasonable steps in attempting to resolve the CCT lockout while preserving safe conditions for workers at CCT. In addition, while Apollo's involvement may in fact have "changed the facts on the ground,"[89] there is no evidence that Apollo's involvement with Chairman Che—as the soon-to-be acquirer of 65% of this joint venture—impeded Cooper's ability to direct its subsidiary or stalled resolution of the lockout.

In further support of its acquiescence defense, Cooper relies on Apollo's representations to Chairman Che and the Mayor of Rongcheng that the parties were legally required to close the transaction, as well as Apollo's other interactions with Chairman Che throughout its pursuit of "Project Charlie." The problem with Cooper's theory, however, is that Cooper cannot demonstrate that it reasonably

---

[88] Defs.' Br. in Support of Mot. for TRO and Declaratory J. at 36 n.24.
[89] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 30 n.10.

understood, based on Apollo's attempts to build a relationship with—or develop an exit strategy for—Chairman Che, that Apollo consented to any breach on Cooper's part resulting from the lockout at CCT. Instead, the evidence presented at trial indicated a good faith effort on Apollo's part to resolve the lockout caused by Chairman Che, not because Apollo accepted any breach caused by the lockout, but because Apollo believed it could close the deal if the lockout at CCT was resolved. That Apollo acted to resolve the dispute with Chairman Che in order to facilitate closing cannot prevent it from seeking to vindicate its rights under the Merger Agreement when those efforts failed.[90]

For the reasons explained above, I find that Apollo is not estopped from challenging Cooper's failure to meet its obligations under the Merger Agreement.

C. *Cooper Breached Section 5.1(a) of the Merger Agreement*

1. The Seizure of CCT

Pursuant to Section 5.1(a) of the Merger Agreement, Cooper must fulfill two separate obligations. First, Cooper "shall, and shall cause each of its Subsidiaries to, conduct its business in the ordinary course of business consistent with past

---

[90] I note that it is clear from the record evidence that Apollo's representations to Chairman Che and the Mayor of Rongcheng indicating that the merger was required to close regardless of the lockout at CCT was a negotiating tactic intended to strengthen both Apollo's and Cooper's negotiating position with Chairman Che, and Cooper undoubtedly understood those statements as such. Indeed, it is easy to envision what Cooper would have argued had Apollo said the opposite—that the lockout could and would impede the transaction. Had Apollo taken such a position, Cooper undoubtedly would have argued that Apollo contributed to the lockout or caused it to continue, and Chairman Che likely would have been even less amenable to negotiating a deal with Apollo.

practice and in compliance in all material respects with all material applicable Laws."[91]  Second, Cooper:

> shall, and shall cause each of its Subsidiaries to, use its commercially reasonable efforts to preserve intact its present business organization, keep available the services of its directors, officers and employees and maintain existing relations and goodwill with customers, distributors, lenders, partners, suppliers and others having material business associations with it or its Subsidiaries.[92]

Notably, the second clause of Section 5.1(a) contemplates the use of "commercially reasonable efforts" by Cooper and its subsidiaries, while the first clause imposes an unconditional obligation.

The parties dispute whether the first or second clause of Section 5.1(a) applies, and, as a result, whether Cooper's obligation to conduct the business of CCT was governed by a "commercially reasonable efforts" standard.  Apollo argues that under the first clause of Section 5.1(a), Cooper has an unqualified obligation to cause CCT to operate its business in the ordinary course, consistent with past practice, and that Cooper was unable to satisfy this obligation due to the lockout at CCT.  According to Apollo, such a reading "makes sense because a company can reasonably be tasked with an absolute requirement to take its *own* actions, and to cause its subsidiaries to do so, 'in the ordinary course.'"[93]  Conversely, Apollo notes that the commercially reasonable efforts standard

---

[91] Merger Agreement § 5.1(a).
[92] *Id.*
[93] Defs.' Br. in Supp. of Mot. for Declaratory J. at 26.

appearing in the second clause of Section 5.1(a) makes business sense in a situation not applicable here, as "with respect to its relationship with third-parties, all that [Cooper] can do is employ commercially reasonable efforts to ensure that others maintain their 'material business associations with it or its Subsidiaries.'"[94] Apollo emphasizes that its reading of Section 5.1(a) is also consistent with Section 6.8, which provides that, "[w]henever this Agreement requires a Subsidiary of [Cooper] to take any action, such requirement shall be deemed to include an undertaking on the part of [Cooper] to cause such Subsidiary to take such action."[95]

By contrast, Cooper argues that the language of Section 5.1(a) distinguishes between "those aspects of Cooper's and CCT's business that are fully within their control, and those aspects that involve third parties," such as CCT's employees or partners.[96] According to Cooper, Section 5.1(a) imposes an obligation on Cooper to operate its subsidiaries' businesses only in relation to those "things that are completely within the control of Cooper or CCT," while a commercially reasonable efforts standard applies "[w]here third parties, such as Cooper's or CCT's employees and partners[,] are involved."[97] Cooper argues that, because "the disruptions at CCT relate entirely to Cooper's ability to maintain existing relations with its joint venture partner and CCT's ability to keep available the

[94] *Id.*
[95] Merger Agreement § 6.8.
[96] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 31.
[97] *Id.*

services of employees and labor unions,"[98] Section 5.1(a) only obligates Cooper to use commercially reasonable efforts to maintain CCT's business. According to Cooper, its efforts satisfied that standard.

Even accepting Cooper's reading of Section 5.1(a), I find that events at CCT cannot be fairly characterized as bearing solely on "Cooper's ability to maintain existing relations with its joint venture partner and CCT's ability to keep available the services of employees and labor unions."[99] Although Cooper characterizes events at CCT as a labor strike, trial testimony and evidence in the record make clear that the disruptions at CCT were far more complicated. The events at CCT do not represent a traditional dispute between labor and capital. CCT employees were not attempting to secure better working conditions or other concessions from their employer, nor were they actively contesting the details of the deal. Instead, CCT employees were told by certain members of management acting under the direction of Chairman Che that they would lose their jobs if they did not strike; that order, in all likelihood, was given not primarily as a result of a disagreement about the Cooper-Apollo deal terms as they affected employees, but for reasons personal to Chairman Che himself. In other words, what appeared to be a labor strike was

---

[98] *Id.* at 32.

[99] *Id.* Because I find this portion of the Merger Agreement unambiguous, I do not consider parole evidence in my analysis. *See Lillis v. AT&T Corp.*, 2007 WL 2110587, at *16 (Del. Ch. July 20, 2007) ("The court will consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract. If the instrument is clear and unambiguous on its face, parole evidence may not be used 'to interpret it or search for the parties' intent.'" (footnotes omitted)).

in fact a mechanism used by Chairman Che to advance his efforts to physically seize the joint venture—a seizure he was legally not entitled to make as he retained only a minority voting interest.

Moreover, the events at CCT were not, as Cooper avers, centered on Cooper's "ability to maintain existing relations with its joint venture partner," Chairman Che; rather, the events at CCT were precipitated by Che's physical takeover of the facilities. As a result of Chairman Che's instigation, Cooper's largest subsidiary—which Cooper had undertaken in the Merger Agreement to cause to operate in the ordinary course consistent with past practice—stopped producing Cooper-branded tires or generating financial statements, and physically prevented Cooper employees from accessing records and facilities. These aspects of the disruption do not implicate Cooper's ability to "keep available the services of its . . . employees" or "maintain existing relations and goodwill with customers . . . partners, [or] suppliers," as Cooper contends, but Cooper's ability to cause its subsidiary—an entity Cooper legally controlled with its 65% ownership interest— to operate in the ordinary course of business.[100] This Court has previously interpreted the contractual term "ordinary course" to mean "[t]he normal and ordinary routine of conducting business."[101] As noted above, CCT halted

---

[100] Merger Agreement § 5.1(a).
[101] *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009).

production of Cooper-branded tires,[102] restricted "certain Cooper employees . . . from entering parts of CCT," and "limited [Cooper's] access to the financials [of CCT]."[103] Cooper, moreover, had only "limited information about to whom [CCT] products [were] being sold."[104]

In fact, Cooper's own actions, while perhaps a reasonable reaction to the extra-legal seizure of CCT, evinces a conscious effort to *disrupt* the operations of the facility. Cooper itself suspended payments to suppliers who continued to ship materials to CCT. As Cooper CFO Brad Hughes testified, "What we did is we said to suppliers that if they had not shipped material that had been—that we would pay for what had been received. We would not pay for shipments that were following a particular point in time."[105] In an internal email dated September 25, 2013 from Cooper's Senior Vice President and General Manager of Asia Operations, Allen Tsaur, to the President of Cooper's International Tire Division, Hal Miller, which Mr. Miller subsequently forwarded to Cooper CEO Roy Armes and General Counsel Steve Zamansky, Mr. Tsaur summarized what he anticipated to be the likely consequences of Cooper's plan to cut off payment to CCT's suppliers:

- OE customers are likely to sue CCT for contract violation and lost time penalty. Please note that CCT supplies to all top 5 truck

---

[102] Trial Tr. 270:15–17 (Hughes).

[103] *Id.* at 343:1–8 (Hughes); *see also id.* at 84:6–85:19 (Armes) (testifying as to Cooper's limited access to CCT financials and restricted access to the CCT facilities).

[104] *Id.* at 273:8–9 (Hughes).

[105] *Id.* at 341:23–342:3 (Hughes).

companies in China

- The raw material payment of 40M RMB is not all for new purchase. Some are for goods already received. Along with our suppliers, they are likely to sue CCT for delinquency.
- Many suppliers are in CCT Purchasing Department office everyday demanding payment.
- CCT is likely to lose in the lawsuits for contract violation and lost time penalty to OE and delinquency for suppliers. The consequence can be very bad as not only we need to pay [sic] but also ruin the creditability. CCT will need to buy on cash in the future.[106]

Reflecting on the plan to "put pressure on Che," Mr. Tsaur concluded: "What this means is that we officially shut down CCT given the low possibilities of Che's willingness to enter financial data. Of course, the issues will go away if Che agrees to enter data for whatever reason. That is currently our only hope to avoid the showdown."[107] These elements of the CCT lockout illustrate Cooper's failure to cause CCT—its largest subsidiary—to conduct business in the ordinary course, and demonstrate just the opposite.

### 2. The "Material Adverse Effect" Exclusions Do Not Trump Cooper's Obligations Under Section 5.1(a)

Cooper asserts that the phrase "except as . . . otherwise expressly contemplated by [the Merger] Agreement" in Section 5.1(a) "naturally incorporates the expressly-contemplated exclusions from events constituting [a

---

[106] JX 445 at COOPER0033397.

[107] *Id.*

Material Adverse Effect]."[108] Cooper argues that, because "the parties expressly agreed that disruptions at CCT caused by the merger would not permit Apollo to abandon the deal," it would be illogical if "the very same event that the parties' intended would not prevent a closing as [a Material Adverse Effect] would prevent a closing by reason of a breach of Section 5.1(a)."[109] Citing to this Court's decision in *In re IBP, Inc. Shareholders Litigation*, Cooper argues that "[s]uch an interpretation, which requires Section[] 5.1(a) . . . to be read in isolation, and not in connection with the [Material Adverse Effect] exclusions, is not only wrong but 'would be unreal to men of business and practical affairs.'"[110]

Section 7.2(c) provides, as a condition to closing, that "[e]xcept for any event, state of facts or circumstances disclosed in the Company Disclosure Letter, since December 31, 2012, there shall not have occurred any event, state of facts or circumstances which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect."[111] The Merger Agreement defines "Material Adverse Effect" by laying out two general categories—subsections (i)

---

[108] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 22.
[109] *Id.* at 20, 22 (emphasis omitted).
[110] *Id.* at 21 (citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 57 (Del. Ch. 2001)); *see also id.* at 21–22 ("If Cooper and Apollo specifically agreed that a negative reaction to the merger by Cooper's labor unions or joint venture partners would not prevent a closing under the [Material Adverse Effect] clause, it is implausible to think that the Merger Agreement would construe those very same circumstances as preventing a closing due to alleged non-compliance with Section 5.1(a) . . . . As in *IBP*, this Court should not accept such a bizarre and implausible construction of the Merger Agreement.").
[111] Merger Agreement § 7.2(c).

and (ii)—and a series of specific carve-outs to subsection (i)—subsections (i)(A)–(J):

> "Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that (i) has had or would reasonably be expected to have a material adverse effect on the business, results of operations or financial condition of the Company, its Subsidiaries and Joint Ventures, taken as a whole, but will not include facts circumstances, events, changes, effects, or occurrences to the extent attributable to . . . (F) the execution and delivery of this Agreement or the public announcement or pendency of the Merger or any of the other Transactions or the Financing, including the impact thereof on the relationships, contractual or otherwise, of the Company or any of its Subsidiaries with employees, labor unions, customers, suppliers or partners, and any litigation arising from allegations of any breach of fiduciary duty or violation of Law relating to this Agreement or the transactions contemplated by this Agreement or compliance by the Company with the terms of this Agreement . . . ; or (ii) that would reasonably be expected to prevent or materially delay or impair the ability of [Cooper] to perform its obligations under this Agreement or to consummate the Transactions.[112]

As noted above, Cooper argues that "[i]f Cooper and Apollo specifically agreed that a negative reaction to the merger by Cooper's labor unions or joint venture partners would not prevent a closing under the [Material Adverse Effect] clause, it is implausible to think that the Merger Agreement would construe those very same circumstances as preventing a closing due to alleged non-compliance with Section 5.1(a)."[113]

---

[112] *Id.* § 10.2 ("Material Adverse Effect") (typeface altered from original).
[113] Pl.'s Br. in Opp'n to Defs.' Mot. for Declaratory J. at 22.

In *IBP*, then-Vice Chancellor Strine, in evaluating a plaintiff-seller's request for specific performance of a merger agreement, addressed the defendant-buyer's defense that the seller had breached certain representations made in the merger agreement when it restated its financial information due to the discovery of improper accounting practices.[114] The relevant provision of the agreement in that case represented that, "[e]xcept as set forth in Schedule 5.11 [or the Warranted Financials], there are no liabilities of the Company or any Subsidiary of any kind whether accrued, contingent, absolute, determinable or otherwise."[115] Schedule 5.11 expressly disclosed that the seller may be subject to further liabilities associated with improper accounting practices, and the buyer acknowledged that the seller's restatement of its financials did not breach Schedule 5.11; nevertheless, the buyer argued that the same facts expressly carved out of Schedule 5.11—the incurrence of liabilities due to the restatement of financial information—breached representations made in the "Warranted Financials." The Court rejected that argument, explaining that at trial, the buyer's CFO could not articulate why the parties would have agreed to such a scheme, while the buyer's general counsel "admitted that it made no economic difference whether the Warranted Financials were restated to record the liabilities or whether those liabilities were recorded in a

---

[114] *In re IBP*, 789 A.2d at 51–52.
[115] *Id.* at 56.

filing for a later period."[116]  Considering the provisions together with additional extrinsic evidence, then-Vice Chancellor Strine concluded that "the record reveals that this sort of hair-splitting has no rational commercial purpose," and that the buyer's construction of the merger agreement did not reflect the parties' intent at the time of drafting.[117]

Here, by contrast, a rational business purpose is evident in the parties' drafting of the definition of Material Adverse Effect in Section 10.2.  Subsection (i) states that any event that "has had or would reasonably be expected to have a material adverse effect on the business, result of operations or financial condition of [Cooper], its Subsidiaries and Joint Ventures," will constitute a Material Adverse Effect, provided that the event does not fall under certain enumerated exceptions.  Subsection (ii) further provides that an event "that would reasonably be expected to prevent or materially delay or impair the ability of [Cooper] to perform its obligations under this Agreement or to consummate the Transaction" will nevertheless *also* constitute a Material Adverse Effect.

If subsection (i) were properly to be considered in isolation, Cooper might be correct that the lockout at CCT falls under the exclusion enumerated in subsection (i)(F), which exempts from the definition of Material Adverse Effect the impact of the pendency of the merger on the relationships of Cooper and its

---

[116] *Id.* at 57.
[117] *Id.*

subsidiaries or partners. However, it is axiomatic that contractual provisions must be read to make sense of the whole.[118] While Cooper understands subsection (i) to shift the risk of certain events, including the lockout at CCT, wholly onto Apollo, the parties made clear under subsection (ii) that Apollo would bear the risk of such an event only so long as that event would not "reasonably be expected to prevent or materially delay or impair the ability of [Cooper] to perform its obligations under [the Merger Agreement]." In other words, the logical operation of the definition of Material Adverse Effect shifts the risk of any carved-out event onto Apollo, *unless* that event prevents Cooper from complying with its obligations under the Merger Agreement; the parties agreed not to excuse Cooper for any such breach.

Evaluating the language of the Material Adverse Effect definition in Section 10.2 in the context of the entire transaction bolsters this reading. As noted above, Apollo intended to finance the transaction in part with a debt offering to be underwritten by Morgan Stanley, Deutsche Bank, Goldman Sachs, and Standard Chartered Bank. In order to facilitate that debt offering, the parties negotiated a 20-day Marketing Period, which by the terms of the Merger Agreement was

---

[118] *See, e.g.*, *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) (stating the principle that "[the court] will read a contract as a whole and we will give each provision and term effect," and ruling in favor of the plaintiff because, "[a]lthough isolated terms and provisions of the contract support [the defendant's] contractual interpretation, the contract as a whole . . . supports [the plaintiff's] interpretation").

required to take place for the merger to close and could not begin until Cooper delivered all Required Information necessary to market the debt. That the parties negotiated a provision in the definition of Material Adverse Effect that protected Apollo's contractual right to require Cooper to comply with its obligations, when those obligations would impact Apollo's ability, among other things, to obtain financing, is not commercially unreasonable. Unlike the irrational contractual interpretation propounded by the buyer in *IBP*, Apollo has convincingly articulated why the parties intended, under subsection (i), to exclude as a Material Adverse Effect an event such as the labor disruption at a subsidiary but, under subsection (ii), to nevertheless require Cooper to comply with its obligations if such an event occurred.

Having determined that the carveout under subsection (i)(F) does not prevent Apollo from enforcing Cooper's obligations under the Merger Agreement, I conclude that Cooper breached its obligations under Section 5.1(a), thereby relieving Apollo of its obligations to close pursuant to Section 7.2(b). Having found that Cooper had not satisfied the condition in Section 7.2(b), I do not find it necessary to consider the other conditions that Apollo alleges Cooper failed to meet, and Apollo is entitled to a declaratory judgment that the conditions to closing remained unsatisfied as of the trial date.

# IV. CONCLUSION

In addition to the USW strike addressed in the USW Opinions, the seizure of Cooper's CCT facility, by the workers at the direction of the minority partner in that venture, emerged as a barrier to the consummation of the Apollo-Cooper merger. The seizure was unanticipated, and neither party caused it to occur; nonetheless, it prevented Cooper from complying with its contractual obligations necessary to close the merger. For the reasons described above, and for the reasons addressed in the USW Opinions, the Defendants' Motion for Entry of a Declaratory Judgment is GRANTED. The parties should submit an appropriate form of order.